# UNITED STATES DISTRICT COURT

for the
Eastern District of Wisconsin

In the Matter of the Search of:

Premises located at 4130 W. Good Hope Road,
Milwaukee, Wisconsin; which is more fully described
in Attachment A.

) 
) 
) 
) 
) 
)

Case No. **19-962 M (NJ)**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B

The basis for the search under Fed. R. Crim P. 41(c) is:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: Title 21, United States Code, Sections 841(a)(1) and 846.

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jeff Hale, DEA, TFO
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: _November 19, 2019_

_____
*Judge's signature*

City and State: Milwaukee, Wisconsin

Nancy Joseph , U.S. Magistrate Judge

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR SEARCH WARRANTS

I, Jeffrey J. Hale, being first duly sworn, hereby depose and state as follows:

### I. BACKGROUND

1. I am a state certified law enforcement officer employed as a Special Agent with the Wisconsin Department of Justice, Division of Criminal Investigation (DCI) and have been a sworn officer in the State of Wisconsin for approximately 24 years. I am currently assigned to the North Central High Intensity Drug Trafficking Area (HIDTA) Heroin Task Force. I am also a federally deputized Task Force Officer with the United States Department of Justice, Drug Enforcement Administration (DEA). As such, I am in an investigative or law enforcement officer of the Unites States with the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

2. I have participated in numerous complex narcotics investigations that involved violations of state and federal controlled substances laws and money laundering laws including Title 21, United States Code, Sections 841(a)(1), 843(b) and 846, and Title 18, United States Code, Sections 1956 and 1957, and other related offenses. I have had both formal training and have participated in numerous complex drug trafficking investigations, including ones using wiretaps. More specifically, my training and experience includes the following:

a. I have utilized informants to investigate drug trafficking. Through informant interviews, and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations

distribute controlled substances in Wisconsin and throughout the United States;

  b.  I have also relied upon informants to obtain controlled substances from dealers, and have made undercover purchases of controlled substances;

  c.  I have extensive experience conducting street surveillance of individuals engaged in drug trafficking. I have participated in the execution of numerous search warrants where controlled substances, drug paraphernalia, and drug trafficking records were seized;

  d.  I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine, cocaine base, ecstasy, and methamphetamine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;

  e.  I am familiar with the language utilized over the telephone to discuss drug trafficking, and know that the language is often limited, guarded, and coded;

  f.  I know that drug traffickers often use electronic equipment and wireless and land line telephones to conduct drug trafficking operations;

  g.  I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such;

  h.  I have been assigned to court-authorized wiretaps and have been trained to operate the equipment utilized to conduct such operations;

  i.  I know that drug traffickers often put their telephones in nominee names to distance themselves from telephones that are utilized to facilitate drug trafficking; and

  j.  I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, and jewelry. I also know that drug traffickers often use nominees to purchase and/or title these assets to avoid scrutiny from law enforcement officials.

  3.  This affidavit is based upon my personal knowledge and upon information reported to me by other federal and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable.

4.    Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

5.    Because this affidavit is submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only facts that I believe are sufficient to establish probable cause.

6.    For the reasons discussed herein, there is probable cause to believe that the premises located at and in **2708 W. Center Street, Apartment #200, Milwaukee, Wisconsin; 5012 N. 42nd Street, Milwaukee, Wisconsin; 4130 W. Good Hope Road, Milwaukee, Wisconsin;** and **3831 N. 24th Street, Milwaukee, Wisconsin**, more fully described in Attachment A, are items that constitute evidence of heroin trafficking and conspiracy to commit heroin trafficking, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

## II.    PROBABLE CAUSE

7.    Since September of 2019, case agents have been investigating Michelle HICKS, Aleisha L. DOWNEY, Michael CARROLL, and others for heroin trafficking conspiracy to distribute heroin, in violation of Title 21, United States Code, Sections 841 and 846. The investigation to date has included traditional law enforcement methods, including, but not limited to: interviews with a confidential source and other individuals, information from other law enforcement officers, documentary evidence, telephone toll

3

data, controlled buys of drugs, and physical surveillance of members of this drug trafficking organization. Based upon confidential source information, physical surveillance, and controlled buys, case agents believe that there is probable cause to believe that violations of Title 21, United States Code, Sections 841 and 846, have been committed, are being committed, and will be committed by Michelle HICKS, Aleisha DOWNEY, and Michael CARROLL. There is also probable cause to believe that **2708 W. Center Street, Apartment #200, Milwaukee, Wisconsin; 5012 N. 42nd Street, Milwaukee, Wisconsin; 4130 W. Good Hope Road, Milwaukee, Wisconsin;** and **3831 N. 24th Street, Milwaukee, Wisconsin,** will contain evidence of those criminal violations.

8. On September 24, 2019, an undercover officer acting under the direction of case agents with the Dane County Narcotics Task Force, contacted a female, later identified as HICKS, at telephone number 608-443-6966 to purchase heroin. HICKS told the undercover officer that a male associate of hers, later identified as CARROLL, was currently on his way from Milwaukee to her residence in Madison, Wisconsin with a supply of heroin. Due to the uncertainty of the male's arrival, the undercover arranged to meet with HICKS the following morning to obtain the heroin. Case agents determined through law enforcement databases that telephone number 608-443-6966 is associated with a white female, Michelle N HICKS (dob: 05/31/1970), with a listed address of 18 Woodridge Court, Unit 6, Madison, Wisconsin.

9. At approximately 4:45 p.m. on September 24, 2019, case agents established surveillance at 18 Woodridge Court in Madison. At approximately 06:30 p.m., case agents observed a maroon colored 2004 Chevrolet Tahoe, bearing Wisconsin registration

4

AEU6809, pull up and park in front of the garage door to 18 Woodridge Court, Unit 6. Case agents observed HICKS exit the driver's seat of the Chevrolet Tahoe and a black male, with a medium build and a bald head, subsequently identified as CARROLL, exit from the front passenger seat, and HICKS and CARROLL entered the residence located at 18 Woodridge Court, Unit 6, Madison, WI.

10.     At approximately 6:40 p.m., a silver colored Chevrolet Impala, bearing Wisconsin registration AEL1095, pulled up and parked directly behind the maroon Chevrolet Tahoe. A heavyset female with dark hair exited from 18 Woodridge Court, Unit 6, and approached the Chevrolet Impala. The driver, a light-skinned male with dark hair, rolled down his window and engaged in what appeared to be a hand-to-hand drug exchange with the heavyset female with dark hair. Shortly after this interaction, the Chevrolet Impala drove out of the area and the heavyset female subject returned inside of 18 Woodridge Court, Unit 6. At approximately 6:45 p.m., HICKS, CARROLL, the heavyset female subject who conducted the hand-to-hand exchange with the Chevrolet Impala, and another heavyset female with blonde hair (subsequently identified as Aleisha L. DOWNEY) exited the residence and all of these subjects entered into the Chevrolet Tahoe, with HICKS as the driver, and the vehicle left the area.

11.     Case agents followed the Chevrolet Tahoe to a check cashing store and then attempted to surveil the Tahoe, but found that due to the erratic driving behavior exhibited by the Tahoe, it was nearly impossible to maintain visual surveillance. The Tahoe drove at a high rate of speed and made frequent sudden lane changes. Eventually, the Chevrolet Tahoe parked in the fire lane adjacent to the food court at the East Towne

5

Mall while a female occupant exited and briefly went inside the mall. Minutes later, the female returned to the vehicle, still idling in the fire lane, and the vehicle drove through the parking lot, eventually parking in an empty area of the JC Penny parking lot. Case agents observed HICKS then exit Tahoe with CARROLL and they both walked into the JC Penney store while DOWNEY walked toward a black colored Dodge Dart sedan, bearing Wisconsin registration 157 SNZ that had parked around the same time. Case agents observed DOWNEY meet with a female inside of the Dodge Dart sedan for a minute or two before exiting and walking back toward the Chevrolet Tahoe as the Dodge Dart sedan left the area completely. Based upon their training and experience and the investigation to date, case agents believe the DOWNEY engaged in a hand-to-hand drug transaction with the female in the Dodge Dart sedan.

12. The registered owner of the 2004 Chevrolet Tahoe, bearing Wisconsin registration AEU6809 is Anthony MARTIN. Based upon public information, Aleisha L. DOWNEY has a child in common with MARTIN and DOWNEY's current address, according to court records, as DOWNEY has an open and pending methamphetamine case, is **4130 Good Hope Road, Milwaukee, WI**. Case agents queried DOWNEY, through Wisconsin Department of Transportation records and found that her updated address as of October 7, 2019 was **4130 Good Hope Rd, Milwaukee, WI.**

13. Based upon my training and experience, I know that a "controlled buy" is a term which refers to a situation in which a confidential informant works with law enforcement officers regarding the purchase of a controlled substance from person(s) at a known address or in a known vehicle; that law enforcement searches the person,

6

clothing, and, if applicable, the vehicle of the informant to make sure that the informant

has no controlled substances or monies on their person; that law enforcement gives the

informant money and watches the informant walk into the known targeted residence or

vehicle; that law enforcement watches the informant walk out of the known targeted

residence or vehicle a short time later and return to law enforcement; that the informant

gives law enforcement the controlled substance(s) which the informant has purchased

inside the residence or vehicle and relates to law enforcement the circumstances of the

purchase; and that law enforcement again searches the informant to make sure that the

informant has no controlled substances or monies on the informant's person or clothing

or, if applicable, in the informant's vehicle.

14.     On September 25, 2019, case agents conducted a controlled buy of heroin

from HICKS at 18 Woodridge Court, Unit 6, in Madison, Wisconsin. At approximately

9:30 a.m., an undercover officer working under the direction of case agents with the Dane

County Narcotics Task Force went to 18 Woodridge Court, Unit 6, and made contact with

HICKS inside of the residence. The undercover officer was shown the Dane County Jail

booking photograph, Wisconsin DOT photograph and Facebook profile photograph of

Michelle HICKS, and positively identified HICKS as the female who sold the undercover

officer heroin on the morning of September 25, 2019. HICKS provided the undercover

officer with a clear plastic sandwich style baggie that was knotted and contained chunks

of a tan powdery substance consistent with the appearance of heroin. This knotted baggie

was inside of another clear plastic sandwich style baggie that was also knotted at the top.

The undercover officer made tentative arrangements to bring payment for the heroin to

7

HICKS later that week, when HICKS said that her male associate would be back in town to stay with her. After the controlled buy case agents seized the recording devices and suspect heroin received from HICKS from the undercover officer. Case agents determined the weight of the suspect heroin was approximately 24.9 grams. Case agents field-tested a random sample of the suspected heroin and found it to test positive for the presence of fentanyl and heroin.

15. On September 29, 2019, at approximately 9:30 a.m. the undercover officer received a phone call from a male subject, subsequently identified as CARROLL, using telephone number 920-636-1475. During the conversation, CARROLL told the undercover officer that he was currently in possession of a large quantity of heroin and inquired as to whether the undercover officer would be able to meet him for an exchange. The undercover officer stated that s/he would not be available that day, and CARROLL said that he was leaving that night and told the undercover officer to call "Michelle" meaning HICKS, whenever s/he was ready to meet on another day. CARROLL indicated that he would leave a large enough quantity of heroin with "Michelle" to fulfill the undercover officer's needs.

16. Case agents obtained Wisconsin Department of Transportation Records for Michael D CARROLL (dob: 08/10/1970) and found the current listed address was 10311 W. Villard Ave #4 Milwaukee, Wisconsin. Case agents observed the photograph of CARROLL, dated January 10, 2019, and concluded that it was the same person shown in the Facebook profile picture for "Mike CARROLL", and was the same subject observed with HICKS during surveillance on September 24, 2019. Case agents determined that

8

CARROLL has multiple prior felony convictions and is currently on state extended supervision and was released from state prison in approximately January of 2019.

17. On October 1, 2019, case agents conducted a controlled buy of heroin from CARROLL. The undercover officer received a call from 920-636-1475 and spoke to a male believed to be CARROLL. CARROLL asked the undercover if s/he would be picking up any heroin on that date, and commented that he would be leaving again soon. The undercover officer indicated that s/he would pick up heroin later in the day, and was directed by CARROLL to contact HICKS when the undercover officer was ready. At approximately 3:30 p.m. that day, case agents observed HICKS leave 18 Woodridge Court in a silver colored 2003 Acura 3.2TL sedan, bearing Wisconsin registration ACL 4577, and at approximately 4:45 p.m., case agents observed HICKS arrive back at the residence in the same Acura sedan. The undercover officer then spoke to HICKS at telephone number 608-443-6966 and HICKS said that she was now ready for the undercover to come to her residence to pick up the heroin. The undercover officer then met with HICKS at 18 Woodridge Court, Unit 6, and HICKS provided the undercover officer with a clear plastic sandwich style baggie that was knotted at the top and contained chunks of a tan powdery substance consistent with the appearance of heroin. This knotted baggie was inside of another clear plastic Ziploc-style bag. The undercover officer made tentative arrangements to bring payment for the heroin to HICKS later in the week, when HICKS said that her male associate would be back in town to stay with her. After the controlled buy, case agents seized the recording devices and suspected heroin from the undercover officer. Case agents weighed the suspected heroin and found the weight to be

9

approximately 31.9 grams. Case agents field-tested a random sample of the suspected Heroin and found it to test positive for the presence of fentanyl and heroin. Later that evening, the undercover officer spoke to CARROLL about the heroin that the undercover officer had picked up from HICKS and they also discussed pricing for future transactions, and CARROLL asked the undercover officer to let him know if the product s/he picked up earlier in the day was good.

18.     On October 7, 2019, case agents participated in a controlled delivery of $2,500 of pre-recorded currency to CARROLL as payment for the heroin received by the undercover on October 1, 2019. On the morning of October 7, the undercover officer spoke to HICKS at the phone number 608-443-6966, and HICKS told the undercover officer that CARROLL was eager to get his money, because he needed to get back to Milwaukee. Case agents provided the undercover officer with $2,500 in pre-recorded U.S. currency, and the undercover officer went to 18 Woodridge Court, Unit 6 in Madison, Wisconsin. The undercover officer made contact with HICKS inside of her residence around 9:35 a.m., and gave the $2,500 in pre-recorded U.S. currency to HICKS as payment for the heroin received on October 1, 2019. The undercover officer mentioned that s/he believed there was a male in a back room, although this male never presented himself. The undercover officer left the residence and departed from the area after delivering the money to HICKS. Shortly thereafter, at approximately 9:50 a.m., case agents returned to 18 Woodridge Court, Unit 6 and resumed surveillance. When case agents arrived in the area, case agents saw Michael CARROLL pacing in front of the garage door at 18 Woodridge Court, Unit 6. CARROLL was holding a cell phone up to

10

his ear as if he was having a conversation. Pursuant to a state warrant, case agents were obtaining location information for CARROLL's cellular telephone, 920-636-1475, at this time. At the time case agents observed CARROLL in front of 18 Woodridge Court, a location alert for his cellular telephone, 920-636-1475 was registering in the area of 18 Woodridge Court, Madison, Wisconsin, with a purported accuracy of 11 meters. Shortly thereafter case agents observed CARROLL and HICKS driving away in the Acura sedan, case agents received additional location information for both HICKS and CARROLL's cell phones, both of which were following a general location path along the interstate highway heading to Milwaukee, and at approximately 11:55 a.m., case agents received a location alert indicating that CARROLL's cellular telephone, 920-636-1475, was registering at 2626 N 27th St in Milwaukee, Wisconsin.

19.     On October 29, 2019, case agents participated in another controlled buy of heroin from HICKS. The undercover officer called HICKS at 608-443-6966 and HICKS told the undercover officer to come to the Walmart store located at 4198 Nakoosa Trail in Madison. HICKS indicated that she was going to be inside of the store and directed the undercover officer to meet inside the store. Case agents were conducting surveillance at the Walmart store, both inside the store and in the parking lot. Case agents observed HICKS exiting an older model tan colored GMC Yukon XL sport utility vehicle in the parking lot, along with CARROLL. At approximately 3:30 p.m. case agents observed the undercover officer meeting with HICKS inside of the Walmart store, near the electronics department, and surveillance agents inside the store, observed CARROLL watching this meeting between and HICKS and the undercover officer. The undercover officer and

11

HICKS then walked into a women's bathroom inside of Walmart, where the undercover officer gave HICKS $1800 in pre-recorded US currency and HICKS gave the undercover officer a clear plastic sandwich style baggie containing what appeared to be Heroin.

20.     Throughout his/her interactions with HICKS on this date, the undercover officer stated that HICKS referred to "Mike" and elaborated on her relationship with Mike and his directions to her relating to selling heroin. HICKS commented that Mike did not want her to conduct the transaction in the bathroom, because he would not be able to see her, but HICKS said that she was more comfortable out of the view of the store cameras. At one point after going into the bathroom, the undercover officer reported observing HICKS' phone light up and produce an audible tone, at which point HICKS manipulated the phone and replied that it was Mike checking up on her. This phone contact took place at approximately 3:38 p.m. After the controlled buy, case agents met with the undercover agent and seized the suspected heroin and recording devices. Case agents weighed the suspect heroin and found the weight to be approximately 45.2 grams. Case agents field-tested a random sample of the suspected heroin and found it to test positive for the presence of fentanyl and heroin.

21.     Based upon review of telephone toll records for HICKS and the undercover officer's statement that HICKS received phone contact from CARROLL at approximately 3:38 p.m., during the controlled transaction, case agents determined that at 3:38 p.m. on October 29, 2019, HICKS received a phone call from the phone number 708-615-4109. At 3:41 PM, HICKS called the number 708-615-4109. Based on this information, combined with the observations of the undercover officer, case agents believe that the number 708-

12

615-4109 is being utilized by CARROLL. On October 31, 2019, case agents obtained a state warrant for pen register, trap and trace, and location data for the phone number 708-615-4109.

22.     On November 5, 2019, case agents participated in a controlled payment to CARROLL for the 45.2 grams of heroin received by the undercover officer on October 29, 2019. The undercover officer contacted HICKS at telephone number 608-443-6966 and was directed to respond to HICKS' residence with the money. The undercover officer went to HICKS' residence and s/he gave $2,000 of pre-recorded US currency to HICKS as partial payment for the 45.2 grams of heroin s/he had bought on October 29, 2019. During this interaction, the undercover officer and HICKS talked about "Mike," that is, CARROLL, and HICKS' role in his heroin trafficking. HICKS stated that she did not want to be in the middle of the arraignment that CARROLL had with the undercover officer and would prefer if CARROLL dealt with the undercover officer directly.

23.     On November 7, 2019, around 2:00 a.m., case agents observed location alerts from T-Mobile plotting the device associated with the number 708-615-4109 at the address **5012 N 42nd Street in Milwaukee, Wisconsin.** Case agents responded to this address and observed a tan colored GMC Yukon XL parked at this location, bearing Wisconsin registration AGW 5082. Case agents continued to receive location alerts for 708-615-4109 registering in close proximity to **5012 N. 42nd Street, Milwaukee, Wisconsin.** This vehicle appeared to be the same vehicle CARROLL was operating during the controlled narcotics transaction from October 29, 2019. Case agents queried Wisconsin registration AGW 5082 through Wisconsin Department of Transportation

13

records and found that the vehicle was registered to a 2004 GMC Yukon XL, to Michael D Carroll (08/10/1970), with a listed address of 10311 W Villard Ave #4 in Milwaukee, Wisconsin. On November 10, 2019, pursuant to a state search warrant, and while the vehicle was parked at **2708 West Center Street**, case agents installed a GPS device on the 2004 GMC Yukon XL, Wisconsin Registration AGW 5082, registered to CARROLL.

24.     On November 15, 2019, case agents executed a state search warrant at 18 Woodridge Court, Unit 6, Madison, Wisconsin. Case agents arrested HICKS and after being advised of her *Miranda* warnings, and waiving them, HICKS provided a statement to case agents. HICKS admitted to selling heroin with CARROLL and provided information to case agents regarding CARROLL's heroin source in Milwaukee, the heroin source's residence, and CARROLL's residences in Milwaukee.

25.     On November 15, 2019, case agents interviewed a confidential source (CS #1) who stated that CARROLL's heroin source of supply in Milwaukee is "Jay." CS #1 stated that near the beginning of October of 2019, s/he met Jay when s/he had driven with CARROLL to Milwaukee to drop off drug proceeds that had been collected from heroin sales in Madison at Jay's residence, identified as **3831 N 24th Street, Milwaukee, WI**. CS #1 stated that while s/he and CARROLL were at **3831 N 24th Street, Milwaukee, WI** CARROLL told CS #1 that CARROLL needed to give the drug proceeds to Jay, but CS #1 did not witness the actual exchanging of money. CS #1 stated that on another occasion when CS #1 was inside **3831 N 24th Street, Milwaukee, WI,** again to drop off drug proceeds, CS #1 recalled hearing CAROLL and Jay speaking in hushed tones in the next room and discussing amounts of money, but CS #1 was not brought into that

14

conversation and did not hear any specifics of what was being discussed. On two other occasions over the past six weeks, CS #1 had been outside of Jay's residence, **3831 N 24th Street,** and observed CARROLL enter the residence and CARROLL stated to CS #1 that the purpose of going to Jay's residence was for CARROLL to drop off money to Jay after returning from collecting drug proceeds in Madison. CS #1 stated that s/he was holding proceeds of heroin trafficking in Madison for CARROLL and that s/he then personally provided that U.S. currency to CARROLL and then accompanied CARROLL to **3831 N 24th Street, Milwaukee,** where CARROLL stated he was providing the proceeds of heroin trafficking to Jay. CS #1 stated that during the trip from Madison to Milwaukee on this occasion CARROLL referred to **3831 N 24th Street** as Jay's "trap house," which case agents know to mean a stash location where traffickers store narcotics and drug proceeds.

26.     For several reasons, case agents believe that CS #1 is reliable and credible. First, CS #1 has been providing continuous information since November of 2019. Second, the information provided by CS #1 is consistent with evidence obtained elsewhere in this investigation where CS #1 was not utilized, and substantial portions of CS #1's information has been corroborated through independent investigation, including surveillance, subpoenaed records, and controlled buys. CS #1 is cooperating for potential consideration on pending heroin trafficking charges. CS #1 has a prior felony conviction for forgery and a prior misdemeanor conviction for resisting.

27.     CS #1 stated that CARROLL had repeatedly spoke of Jay as being his source of heroin and mentioned a number of times to CS #1 that he (CARROLL) was in a hurry

to get back to Milwaukee from Madison to give Jay the proceeds of his heroin sales in Madison. CS #1 stated that CARROLL was being "fronted" drugs by Jay and would provide payment after he had sold the drugs in Madison. In addition to CARROLL referring to Jay as "his source," CS #1 said that while in the car with CARROLL on the way to Milwaukee, s/he overhead conversations where CARROLL was talking about the money he was bringing and was calling the person he was talking to "Jay" in conversation. On November 15, 2019, CS #1 identified **3831 N 24th Street, Milwaukee, WI** as Jay's residence. The utilities for **3831 N. 24th Street** come back to Jayson Drain, and the account was established at that address on June 28, 2018. Jayson Drain (dob: 11/15/1981) is also currently associated with **3831 N. 24th Street** through several different public and law enforcement databases. CS #1 was shown a photograph of Jayson Drain without any identifying information and stated that s/he believed that Drain looked like the individual s/he knows as "Jay," and CARROLL's source of supply for heroin; however, CS #1 stated that s/he believed that Jay had more facial hair. Drain has multiple felony convictions, including possession with intent to distribute heroin 400-900 grams and manufacture/deliver cocaine. Case agents reviewed GPS information from the GMC Yukon registered to CARROLL, which revealed multiple occasions where the GPS information for the GMC Yukon is located at **3831 N 24th Street**.

28.     CS #1 further stated that the two primary residences CARROLL is currently utilizing in Milwaukee are the residence of his aunt, identified as **2708 W. Center Street, Apartment #200, Milwaukee, Wisconsin** and his ex-girlfriend, Latonya Martin's residence **5012 N. 42nd Street, Milwaukee, Wisconsin**. CS #1 stated that CARROLL

16

stated that his aunt's name was Wanda and CS #1 had been to Wanda's residence on multiple occasions over the past 6 weeks. CS #1 stated that s/he had Wanda's address in the GPS application on CS #1's phone and provided case agents the address saved in her phone as **2708 W. Center Street**. CS #1 was unsure of the exact apartment number, but said that it was on the second floor, and described that as you enter the second floor hallway from the stairwell, the door to CARROLL's aunt's apartment was the second door on the right. While in Milwaukee with CS #1, case agents drove past **2708 W. Center Street** and CS #1 confirmed that this was CARROLL's primary residence in Milwaukee, where he resided with his aunt Wanda.

29.     CS #1 stated that CARROLL told him/her that CARROLL never brings his guns to Madison, because "he doesn't know anybody there," and thus, he would not need to protect himself from anyone looking to do him harm. CS #1 stated that CARROLL stores his guns at various houses of female associates, including his aunt Wanda and his ex-girlfriend Latonya Martin. CS #1 recalled on one occasion in October of 2019, after arriving at **2708 W. Center Street** before driving with CARROLL back to Madison, CARROLL handed his aunt, Wanda Willis, what was clearly recognizable as a gun wrapped in cloth. CS #1 identified it as a gun by context of the way CARROLL was handling it and referring to it. CARROLL told his aunt, "put this up for me", which CS #1 took to mean he was asking her to store it in a safe place for him while he was gone.

30.     Case agents searched public databases and determined that Wanda M Willis (dob: 09/02/1958) has a local address of **2708 W. Center Street, Apartment #200, Milwaukee, Wisconsin**. Wanda Willis is the current utility subscriber on an active utility

17

account that was established on June 27, 2019, at **2708 W. Center Street, Apartment #200, Milwaukee, Wisconsin.** Moreover, review of CARROLL's telephone tolls revealed that CARROLL had repeated contact with the phone number 520-251-7031, which is associated with Wanda Willis and is also listed as a contact number on Willis' WE Energies account associated with **2708 W. Center Street, Apartment 200, Milwaukee, Wisconsin.** CS #1 described the apartment as being on the second floor, either the 1st or 2nd apartment on the right as you come out of the stairwell. On November 18, 2019, case agents responded to **2708 W. Center Street** and confirmed that Apartment #200 is the first door to the right after exiting the stairwell.

31.     Case agents have repeatedly observed vehicle GPS data for the 2004 GMC Yukon bearing WI registration AGW 5082, and location data for CARROLL's cellular telephone 708-615-4019 that was consistent with being at **2708 W. Center Street, Milwaukee, Wisconsin,** including frequently spending the overnight hours at the address. Also, on November 10, 2019, case agents personally viewed the 2004 GMW Yukon parked in the lot of **2708 W. Center Street** at approximately 4:30 a.m.

32.     CS #1 further stated that CARROLL also resides at Latonya's (subsequently identified as Latonya Martin) house in Milwaukee, and stated that Latonya is a woman who CARROLL had dated previously for approximately eight years. CS #1 stated that CARROLL told CS #1 that he also stores guns at Latonya's residence. During a phone call CS #1 had with CARROLL in mid-October of 2019, CARROLL stated that he had just left Latonya's house and that he had gone there to retrieve some of his guns that he was storing there and he ran into Latonya's child's father, which upset him. Latonya's house

18

was identified as **5012 N. 42nd Street, Milwaukee, Wisconsin**. Location data from CARROLL's cellular telephone 708-615-4019 and GPS data from CARROLL's Yukon truck, as recently as last night, consistently reveals that it is in the immediate area of **5012 N. 42nd Street,** including frequently overnight. For example, location data from CARROLL's cellular telephone 708-615-4019 was in the immediate area of **5012 N. 42nd Street** from approximately 3:09 a.m. on October 3, 2019, to 7:09 a.m. on October 3, 2019. Location data for CARROLL's cellular telephone 708-615-4019 revealed it was in the immediate area of **5012 N. 42nd Street** from approximately 3:23 p.m. on November 6, 2019, to 04:53 p.m. on November 7, 2019. Case agents also received location data from CARROLL's cellular telephone 708-615-4019 in the immediate area of **5012 N. 42nd Street** from approximately 7:23 p.m. to 8:08 p.m. on November 7, 2019, and then from approximately 6:23 a.m. on November 8, 2019 to 9:23 a.m. on November 8, 2019.

33.     As mentioned earlier in this affidavit, on November 7, 2019, case agents conducted surveillance at **5012 N. 42nd Street** and observed the tan colored GMC Yukon bearing WI registration AGW 5082 registered to CARROLL in the driveway next to a white colored Chevrolet Impala bearing Wisconsin registration 180 YMV. Case agents queried the registration information for both of these vehicles through Wisconsin Department of Transportation records and found that the GMC Yukon was still registered to CARROLL, and the Chevrolet Impala was registered to Latonya Martin at **5012 N. 42nd Street, Milwaukee, Wisconsin**. Latoya Martin is the current utility subscriber on an active utility account that was established on June 18, 2016, **5012 N. 42nd Street, Milwaukee, Wisconsin**.

19

34.     Case agents queried the address **5012 N. 42nd Street, Milwaukee, Wisconsin** through public databases, and found that CARROLL is associated with **5012 N. 42nd Street, Milwaukee, Wisconsin** according to multiple credit reporting agencies. Additionally, according to multiple law enforcement databases Latonya Martin uses cellular telephone number 414-499-7686 and Latonya Martin provided 414-499-7686 as her phone number to WE Energies. A review of CARROLL's telephone toll records reveals that CARROLL is in frequent phone contact with Latonya Martin at 414-499-7686.

35.     On November 15, 2019, CS #1 further stated that DOWNEY is the girlfriend of Tony (subsequently identified as Anthony MARTIN) and that MARTIN sells drugs for CARROLL as does DOWNEY. CS #1 further stated that s/he has overheard phone calls between CARROLL and MARTIN where CARROLL spoke about fronting quantities of drugs to be paid for at a later time to MARTIN. CS #1 also stated that s/he overhead CARROLL mention on another phone call to another unknown person that CARROLL was upset with MARTIN and was considering "cutting him off" and no longer providing him with quantities of drugs to sell if his behavior did not change. Additionally, CS #1 stated that on September 24, 2019, while case agents were conducting surveillance in the JC Penney parking lot and believed they witnessed a hand-to-hand drug transaction, DOWNEY had told CS #1 that DOWNEY met with a female in the Dodge Dart sedan after saying she had to "take care of some business," which CS #1 believed meant that DOWNEY was selling drugs.

36.     CS #1 stated that Tony and DOWNEY live together in an apartment on Good Hope Road in Milwaukee. On November 15, 2019, CS #1 positively identified

20

DOWNEY's residence as **4130 W. Good Hope Road, Milwaukee, Wisconsin**. CS #1 stated s/he had been inside of **4130 W. Good Hope Road, Milwaukee, Wisconsin** during the second week of October of 2019. Case agents have repeatedly observed vehicle GPS data and location data from CARROLL's cellular telephone 708-615-4019 that is consistent with being at **4130 Good Hope Road Milwaukee, Wisconsin,** including several instances where CARROLL is spending the overnight hours at **4130 Good Hope Road, Milwaukee, Wisconsin**. For example, case agents received location data from CARROLL's cellular telephone 708-615-4019 in the immediate area of **4130 Good Hope Road** from approximately 10:39 p.m. on November 7, 2019, to 6:08 p.m. on November 8, 2019. Similarly, case agents received location data from CARROLL's cellular telephone 708-615-4019 in the immediate area of **4130 Good Hope Road** from approximately 12:09 a.m. on October 5, 2019 to 8:54 a.m. on October 5, 2019. Another example of the many instances where location data from Carroll's cellular telephone 708-615-4019 occurring during overnight hours at **4130 Good Hope Road** took place was on November 6, 2019, where the data received placed CARROLL's cellular telephone near **4130 Good Hope Road** between 1:08 AM and 07:08 AM. Anthony MARTIN is the current utility subscriber on an active utility account that was established on September 16, 2019, **4130 Good Hope Road, Milwaukee, Wisconsin**.

37.     Based upon their training and experience and the investigation to date, case agents are aware that drug traffickers commonly maintain evidence of their drug trafficking, including drug ledgers, financial documents, U.S. currency, cellular telephones, customer contact information, jewelry or other items purchased with drug

proceeds, in their homes or "stash" houses. Case agents are also aware it is common practice for individuals who are involved in business activities of any nature to maintain books and records of such business activities for lengthy periods of time. Because narcotics trafficking generates large sums of cash, it requires the keeping of detailed records as to the distribution of narcotics as well as the laundering of the proceeds. Such records also typically provide evidence as to the identity of additional criminal associates who are facilitating the laundering of the narcotics proceeds on behalf of the organization. These records, unlike controlled substances, are often maintained for long periods of time, even several years, based on case agents' training and experience. It is also common practice for individuals who maintain these records to keep them in places that are secure but easily accessible such as in their businesses or personal residences.

## CONCLUSION

38.     Case agents believe, based on the facts contained within this affidavit, that there is probable cause to believe that the locations described in paragraph 6 and more fully described in Attachment A, have been and are continuing to be used as part of a conspiracy to possess with intent to distribute heroin, in violation of Title 21, United States Code, Sections 841(a)(1) and 846. Based on the foregoing, there is probable cause to believe that located within the locations described in paragraph 6 above and more fully described in Attachment A, there is evidence pertaining to the fruits, instrumentalities, and proceeds of drug trafficking more specifically in Attachment B, Items to be Seized.

22

## ATTACHMENT A
## Property to be Searched

**4130 W. Good Hope Road**:  4130 W. Good Hope Road is one unit of a multi-unit apartment complex, located on the north side of W. Good Hope Road primarily constructed of tan brick and tan siding. The numbers "4130" are displayed to the east of the red, south facing entry door. A mailbox is affixed to the left of the entry door.



## ATTACHMENT B
## ITEMS TO BE SEIZED

All records relating to violations of 21 U.S.C. §§ 841(a)(1) and 846, including but not limited to:

All bank records, checks, credit card bills, account information, and other financial records;

Financial records, documents, statements, or other evidence of control of bank or other financial accounts and investment funds;

Lists of drug customers and related identifying information;

Types, amounts, and prices of drugs trafficked, as well as dated, places, and amounts of specific transactions;

Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

Indicia of residency;

Safes, vaults, or lock boxes used to store proceeds or records from these crimes;

U.S. Currency; and

Cellular telephones and all electronic storage areas on the device including stored telephone numbers, recently called numbers list, text messages, digital audio and or video recordings, pictures, settings, and any other user defined settings and/ or data.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies)